UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JENNIFER C. L.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 1:20-cv-02676-RLY-DML |
| | ) |
| KILOLO KIJAKAZI,[2] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

Report and Recommendation on
Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its appropriate disposition. As addressed below, the Magistrate Judge recommends that the District Judge AFFIRM the decision of the Commissioner of Social Security that plaintiff Jennifer L. was not disabled.

---

[1] To protect privacy interests of claimants for Social Security benefits, the Southern District of Indiana has chosen to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions. The plaintiff will therefore be referred to by her first name.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is substituted for Andrew Saul as the defendant under Fed. R. Civ. P. 25(d) and the last sentence of 42 U.S.C. § 405(g) (action seeking judicial review of final decision of the Commissioner of Social Security "shall survive notwithstanding change in the person occupying the office of Commissioner of Social Security or any vacancy in such office").

## Introduction

Jennifer applied in July 2018 for Disability Insurance Benefits under Title II of the Social Security Act. Her application was denied initially and upon reconsideration, and a hearing was held on January 28, 2020, before administrative law judge Rita Elizabeth Foley. The ALJ issued her decision on February 24, 2020, that Jennifer was not disabled at any time between her alleged onset date and the ALJ's decision. The Appeals Council denied review on August 20, 2020, rendering the ALJ's decision the final decision of the Commissioner. Jennifer timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

Jennifer contends that the ALJ erred because she (1) erroneously evaluated Jennifer's statements about the effects of her impairments on her functioning, (2) did not appropriately account in the hypothetical question to the vocational expert and in the RFC for Jennifer's complaints of severe fatigue, hyper somnolence, and excessive daytime sleeping, and (3) included in the RFC an upper limit for Jennifer to be off-task during the workday but without providing support for choosing that limit.

The court will first describe the legal framework for analyzing disability claims and the court's standard of review and then address Jennifer's assertions of error.

## Standard for Proving Disability

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Jennifer is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her age, work experience, and education (which are not considered at step four), and her RFC; if so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but it does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for her decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

Before addressing Jennifer's specific assertions of error, the court provides background information about her past work activity and her medical impairments and then summarizes the ALJ's sequential findings.

## Background

**A.    Jennifer has extensive experience in the insurance industry.**

Jennifer was born in 1970, was 47 years old as of her alleged onset date in April 2018, and was 49 years old as of the date of the ALJ's decision. Jennifer traces her onset date to a period when she resigned from her job as a field underwriter for Cincinnati Insurance Company because she felt she no longer was mentally capable of performing the tasks required. Before working for Cincinnati, Jennifer had had other skilled jobs with insurance companies or agencies beginning about 2003. She worked for Secura Insurance as a marketing representative from 2003 to 2006, for Gregory & Appel as an insurance agent from about 2006 to 2010, and for Selective Insurance Company as a field marketing manager from 2011 to 2014. See R. 43-46. According to the vocational expert, all of these jobs constitute

"skilled" work under Agency regulations, at a level requiring between 2 to 4 years of "vocational preparation" and good cognitive functioning. *See* POMS (the Agency's Program Operations Manual System) DI 25001.001, "Quick Reference Guide for Medical and Vocational Evaluation," ¶¶ 75 and 77.

After her resignation from Cincinnati Insurance in April 2018, Jennifer held part-time jobs. She worked for J.C. Penney beginning in July 2018, and then started a job at Ann Taylor Loft in August 2018. She worked the "floor" at Ann Taylor, assisting customers, and was on her feet the entirety of her shifts. Jennifer was still working for Ann Taylor at the time of the administrative hearing in January 2020. She worked about 10-15 hours per week on average, though her hours were greater during the Christmas shopping seasons.

### B. Jennifer has suffered from hydrocephalus and vertigo.

The ALJ determined that the medical evidence of record established that Jennifer has suffered from two severe medically determinable impairments: hydrocephalus and vertigo. She found that three other medical impairments (plantar fasciitis, hyperthyroidism, and a history of Grave's Disease in remission) were reflected in the records, but there was no evidence that any effects of these impairments have caused or would cause more than minimal limits on Jennifer's ability to perform work-related tasks for a period of 12 months. She found that even though Jennifer also received some treatment—medication—for depression and ADHD, these mental impairments were non-severe too because they caused only mild deficits for Jennifer in the broad areas of functioning used to test the severity

6

of mental impairments. Finally, the ALJ considered Jennifer's statements that she suffered from episodes of narcolepsy (a sleep disorder "characterized by overwhelming daytime drowsiness" and difficulty with staying awake for long periods, *see https://www.mayoclinic.org/diseases-conditions/narcolepsy/symptoms-causes/syc-20375497*). Here, the ALJ decided that the record contained "no clinical signs or objective findings establishing the existence of a condition or condition that could reasonably be expected to produce the alleged symptoms." (R. 21). She also noted that Jennifer had never "undergone any sort of sleep study." (*Id.*)

Jennifer does not challenge the ALJ's evaluation about which medical impairments qualified as severe and non-severe, those that had no more than minimal effect on her work abilities, and those that were not supported by *any* clinical signs or objective findings.

Jennifer has been treated for hydrocephalus, which is the buildup of fluid in the ventricles within the brain and thereby puts pressure on the brain. *See https://www.mayoclinic.org/diseases-conditions/hydrocephalus/symptoms-causes/syc-20373604.* Because of fluid buildup, one with hydrocephalus has an unusually large head. *Id.* In February 2016, Jennifer underwent the placement of a ventriculoperitoneal shunt to drain the excess fluid in the ventricles of the brain. Thereafter, she saw a neurologist (Dr. Fisch) for evaluation and the treatment of any effects of the disorder. His treatment is discussed in more detail in the Analysis section. With respect to vertigo, the ALJ recognized that Jennifer's

7

medical providers made a diagnosis of vertigo because of her periodic complaints about lightheadedness.

### C. The ALJ determined at step five that Jennifer was not disabled.

At step one, the ALJ noted that Jennifer's earnings after her alleged onset date had approached a level of substantial gainful activity (which was approximately $3600 in the relevant years) in certain quarters but did not surpass it. For example, Jennifer's earnings in 2019 from her job at Ann Taylor were about $3,300 per quarter. Moreover, the amount of money she earned in the second quarter of 2018 (about $9,500) was attributable to her work in April of that year when she resigned from Cincinnati Insurance. As noted above, the ALJ determined at step two that Jennifer suffered from severe impairments; at step three, she found that none met or medically equaled any of the Listings. Jennifer does not challenge the ALJ's determinations at steps one through three.

For the RFC, the ALJ decided that Jennifer could perform light work, which is defined as the ability to sit up to six hours in a work day, engage in a "good deal of walking or standing," generally up to six hours total in a work day, frequently lift up to 10 pounds, and never lift more than 20 pounds. *See* 20 C.F.R. § 404.1567(b). The ALJ added other physical and work environment restrictions, limiting Jennifer to only occasionally climbing stairs and balancing, and an environment with no exposure to unprotected heights or to extreme cold, heat, or dampness. Finally, the ALJ added numerous restrictions related to mental tasks because of the effects of Jennifer's hydrocephaly:

> [Jennifer] is limited to work involving only simple, routine and repetitive tasks, performed in a work environment free from fast-paced production requirements, involving only simple work-related decisions, and with few, if any work place changes . . .; in addition to regularly scheduled breaks, the claimant would be off task 10% of the time during an 8 hour work day.

(R. 22).

As the vocational expert explained, these limitations would not allow Jennifer to perform her past relevant work, all of which was skilled. But the VE testified, based on Jennifer's vocational profile and RFC, that she was capable of the tasks required of the jobs of Mail Clerk, Photo Copy Machine Operator, and Checker I. The ALJ relied on the VE's testimony and found that Jennifer could perform these jobs and that they existed in substantial numbers in the national economy. Thus, she concluded at step five that Jennifer was not disabled at any time between her alleged onset date in April 2018 and the date of the ALJ's decision.

The court now addresses Jennifer's contentions that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded.

## Analysis

### I. Jennifer's contentions focus on the ALJ's failure to accommodate her fatigue and memory or concentration effects of her impairments.

Jennifer makes a highly generalized argument that the ALJ's evaluation of Jennifer's statements about her symptoms and other effects of her impairments is flawed. She contends it's flawed because the ALJ should not have characterized Jennifer's treatment as "conservative," relied on the "stability" of her symptomology, or emphasized her daily living activities and part-time work, but

9

Jennifer does not point to any particular error within the RFC that these alleged flaws produced. For specifics, she contends only that the ALJ (a) did not properly address Jennifer's complaints throughout the record (and during the hearing) about her fatigue, drowsiness, or excessive daytime sleeping and (b) relatedly, did not include any explanation about why Jennifer could be off task 10% of a workday but not more (or less).

The court sets forth its standard for reviewing an ALJ's evaluation of a claimant's subjective statements and then addresses Jennifer's general arguments about flaws in the ALJ's evaluation and the contentions about Jennifer's fatigue and off-task limits.

## II.  An ALJ's evaluation of a claimant's subjective statements is entitled to special deference.

Under SSR 16-3p, an ALJ is required to evaluate a claimant's subjective symptoms and their effects on her functioning in light of the relevant objective medical evidence, the consistency (or lack of it) across time of the claimant's descriptions about her symptoms and their effects, the activities the claimant has engaged in and whether and how she may have structured her activities to minimize her symptoms to a tolerable level, and any other information such as about medications, precipitating and aggravating factors, and treatment that may shed light on the persuasiveness of the information the claimant provides.

An ALJ's evaluation is entitled to special deference from the court unless it can be said to be "patently wrong." *Engstrand v. Colvin,* 788 F.3d 655, 660 (7th Cir. 2015). A court may find it patently wrong if the ALJ's determination is not

"competently" explained or is grounded in reasons that are not supported by the record, *id.,* or are otherwise factually or logically mistaken. *Allord v. Barnhart,* 455 F.3d 818, 821 (7th Cir. 2006). But the evaluation should be upheld when the ALJ provides specific reasons tied to the record. *Burmester v. Berryhill,* 920 F.3d 507, 510-11 (7th Cir. 2019); *Alvarado v. Colvin,* 836 F.3d 744, 749 (7th Cir. 2016) (A credibility determination "tied to evidence in the record" may not be disturbed as patently wrong.) Further, even if the ALJ's determination "is partially flawed and based on factual findings that 'are a bit harsh,' [it] will be disturbed only if the ultimate conclusion is 'patently wrong.'" *Kellems v. Astrue,* 382 Fed. Appx. 512, 516 (7th Cir. 2010).

As explained below, the court finds plenty within the ALJ's decision that explains the bases for the ALJ's decision about an appropriate RFC and why she rejected Jennifer's statements about her inability to work because of excessive sleepiness, fatigue, or memory problems, or that she otherwise needed more accommodations than the ALJ accorded her.

### A. The ALJ's credibility evaluation is not patently wrong.

The ALJ's decision makes clear that she willingly accommodated many statements by Jennifer and her doctor about the effects of her hydrocephaly and feelings of vertigo, but she rejected Jennifer's contentions that she could not possibly work at any job on a full-time basis because of her fatigue or problems with mental concentration. A review of Jennifer's medical treatment and reports of activities, which the ALJ discussed in her decision, is helpful to understanding the

11

ALJ's ultimate finding that Jennifer's statements about her symptoms and their effects were only partially credible.

### 1. Jennifer saw a neurologist to follow the effects of her hydrocephaly.

Jennifer received follow-up treatment about the effects of her hydrocephaly primarily from Dr. Fisch, a neurologist, though her other care providers routinely noted information relevant to that condition. A review of the medical evidence indicates that, as the ALJ found, Jennifer's treatment after her alleged onset date was conservative in nature, reflected a stability of her symptoms, and the efficacy of treatment for some of those symptoms.

The administrative record reflects three annual visits by Jennifer with Dr. Fisch, one that occurred in November 2017 before Jennifer's alleged April 2018 onset date, and two others in August 2018 and August 2019, respectively. At the 2017 appointment, which appears to be the first appointment with Dr. Fisch after Jennifer underwent the shunt placement, she told Dr. Fisch that it took her about three months to recover from the February 2016 shunt placement but that she was doing well and felt that her gait issues had improved. Dr. Fisch's examinations were essentially unremarkable, as the ALJ found. At the 2017 appointment, he concluded that Jennifer's cranium was atraumatic and normocephalic (meaning, "normally shaped") and she had normal facial sensation, smell and visual fields. He found no motor weakness or abnormal cerebellar function, and noted she had normal muscle strength reflexes and a steady gait. She was also alert, oriented, and had normal concentration and memory. Dr. Fisch also noted Jennifer's report

that [d]aytime sleepiness is still a problem," and although she takes Adderall to help her sleepiness, sometimes she still gets sleepy in the afternoon. (R. 389). This complaint about sleepiness occurred well before Jennifer quit her insurance job because she could not keep up with the work load.

At the August 2018 appointment—which was after Jennifer resigned from her job and applied for disability benefits—Jennifer reported to Dr. Fisch that she is having "mounting cognitive issues," trouble shifting her attention, and remembering basic items, and that those problems had caused her to lose her job. (R. 399). Dr. Fisch recorded the same information about daytime sleepiness as he had at the November 2017 appointment and repeated the same statement from before that Jennifer is having gait problems but has not fallen. On examination, Dr. Fisch found that Jennifer did not exhibit motor weakness or tremors and she had normal muscle strength reflexes and a steady gait. He also made the same general neurological findings as he had the year before, concluding that Jennifer's cranium was atraumatic and normocephalic, and she had normal extraocular movements, facial sensation, and smell, and her visual fields were full. With respect to his mental status report, Dr. Fisch stated that although Jennifer was alert and oriented, she had reduced concentration and memory—two things Jennifer had reported to him. The August 2019 appointment report gives a narrative history of illness that is materially identical to the report from the year before. (R. 477). The physical examination results are materially identical as well.

Further, as Dr. Fisch stated on his August 2018 and 2019 reports, he did not believe that Jennifer's cognitive performance would improve or that the current effects of her hydrocephalus, despite the shunt, could be reversed. (R. 480). Thus, the cognitive decline that led to Jennifer's loss of her job in April 2018 was not expected to reverse itself.

### 2. Other treatment providers similarly found that Jennifer did well, but she was not able to keep her high-level skilled job.

Jennifer periodically saw other providers. Their notes of visits generally indicate that Jennifer has done well except that she was not able to work at the skill level her previous insurance job had demanded.

Jennifer saw Dr. Bain to follow up on an earlier diagnosis of Graves' disease, which is an immune system disorder that causes overproduction of thyroid hormones. *See https://www.mayoclinic.org/diseases-conditions/graves-disease/symptoms-causes/syc-20356240.* The record shows three annual visits with Dr. Bain, in 2017, 2018, and 2019. Each time Dr. Bain noted that the Graves' disease was in remission. At the 2017 visit, Dr. Bain indicated that Jennifer's complaints of feeling more fatigued lately was likely caused by many factors, including that she was awakened by night sweats because of perimenopause and other times by her sleeping partner's snoring. At each visit, Dr. Bain noted that Jennifer had normal motor strength and tone and normal gait and station. (R. 307, 304, 446). Dr. Bain's report from the June 2018 visit (which occurred a few weeks before Jennifer applied for disability) states that Jennifer is complaining about fatigue, but she also "appears to be feeling well" and looks healthy. (R. 304). At the

14

July 2019 visit, although Jennifer complained about fatigue, she also told Dr. Bain that her activity level had decreased for a short period because of plantar fasciitis but she still had been able to lose weight, suggesting that even despite a problem with her feet, Jennifer was still engaging in sufficient physical activity to lose weight. (R. 446).

Jennifer told other doctors about fairly substantial levels of activities she engages in. She saw personal care physicians intermittently. In February 2018, about four months before applying for disability, Jennifer told her doctor (Dr. Russ) that she had been walking, going to the YMCA, and riding her bike to get exercise. (R. 348). In April 2018, Dr. Donaldson reported that Jennifer appeared to be functioning fairly well, except that she was processing things more slowing than she had been able to do in the past. (R. 293). And in November 2018, Jennifer told Dr. Russ that she was taking Adderall prescribed by her neurologist (which was prescribed to treat Jennifer's complaints about fatigue) and "[d]oing well on it," and that her anxiety and depression were "good on the Prozac." (R. 413).

In addition to the physical activities that Jennifer reported to her doctors, the ALJ also stressed that Jennifer engaged in a wide range of other activities. After alleged disability onset and continuing for well more than a year and at the time of the administrative hearing, Jennifer held a part-time 10-15-hour/week job requiring being on her feet the entire time and providing customer service in a fashionable clothing store. She is a social person, and the ALJ noted that she participates daily in social activities such as talking on the phone, emailing, texting, and participating

15

on Facebook. She also takes care of her own personal needs and the needs of a pet. She does her own laundry, shops, cooks, and handles her own finances. And she has hobbies such as reading, walking, and watching movies and television shows. *See* R. 23-24.

With this background in mind, the court now addresses the specific issues raised by Jennifer concerning the ALJ's evaluation of her statements.

### 3. The ALJ did not err in deciding that Jennifer's level of activities indicates she is capable of more than she described.

The court rejects Jennifer's contention that the ALJ overstated the extent of her activities; all of the activities listed by the ALJ are fully supported by the record. Nor did the ALJ equate the activities with the ability to work full time. There is nothing within the ALJ's decision suggesting that if Jennifer can work part time (and engage in some of the other activities she described), then she must be able to work full time. Instead, the ALJ merely stressed, as was perfectly appropriate, that Jennifer's ability to work regularly (making about the same amount of money every quarter and just below the level of substantial gainful activity) doing a job requiring a high level of customer interaction and being on one's feet constantly was not consistent with the way Jennifer described her own symptoms, including constant fatigue and inability to regularly stay awake. Further, contrary to Jennifer's contention, the ALJ noted that Jennifer complained about fatigue (*see* R. 23—Jennifer "experiences fatigue and difficulty walking and navigating stairs") and that Jennifer had even suggested she suffered from a very serious sleep disorder (narcolepsy). The ALJ's conclusion that the record did not

16

reflect medical signs, symptoms, or reporting to support its existence as a medically determinable impairment is well supported, or that it needed any more accommodation with the RFC is supported by substantial evidence.

### 4. The ALJ did not err in characterizing the medical evidence as showing stable and conservative medical treatment.

As the above summary of Jennifer's medical treatment indicates, the court cannot find any error in the ALJ's characterization of it as conservative treatment based on stable health. For Jennifer's most serious problem—hydrocephaly—she had had three annual appointments and the reports from each of them differed only slightly—with one of the appointments occurring before Jennifer's alleged onset date. The doctor who treated her other serious problem—Graves' disease—similarly saw her annually, each time noting that the disease was in remission and that Jennifer's overall health was good. The recurrent theme throughout the medical records and other documents is that Jennifer no longer can perform cognitively at the level she was able to perform for years in the insurance industry, but not that she is incapable of working any full-time job.

### 5. The ALJ accepted that Jennifer had suffered a decline in mental functioning and gave credence to her doctor's opinion.

That a decline in cognition is an effect of her impairments was fully accepted by the ALJ. Indeed, as the ALJ explained, she adopted an RFC that reflects an accommodation of that decline and related effects on her mental functioning because of the hydrocephalus, as her own neurologist suggested. Dr. Fisch provided a narrative description of Jennifer's problems dated January 16, 2020, a date just

17

before the January 28 administrative hearing. He explained that Jennifer has diminished cognitive function "primarily" presenting as memory problems, issues with task sequencing, and attention issues, and that "mentally demanding" and "stressful" circumstances can exacerbate those issues. He also noted that the impairment causes some issues with balance and coordination. (R. 481).

      The RFC tracks Dr. Fischs's suggestions. It provides for only occasional balancing and stair climbing activities and forbids unprotected heights and the climbing of ladders, ropes, or scaffolds. It forbids fast-paced work environments, and thus requires lower stress environments. And it limits Jennifer—who had for years worked as a skilled professional—to the simplest of tasks: tasks that are routine, repetitive, require only simple work-related decisions and few, if any, work place changes. The court can track the ALJ's reasoning that these limitations sufficiently addressed Dr. Fischs's concern that Jennifer could not engage in a mentally demanding job or one requiring the kind of "task sequencing" or "memory" that is not present when one does something repetitive and requiring only simple decisions. In addition, the ALJ well explained why she rejected a work function opinion that Dr. Fisch had provided at an earlier time, in which he indicated Jennifer could do basically nothing—no standing, no walking, no sitting more than one hour in a day, no lifting of anything, and a complete inability to carry out simple work tasks or low stress jobs. The ALJ's willingness to substantially accommodate Dr. Fisch's January 2020 view about the kinds of mental tasks that

18

pose difficulties for Jennifer after he had provided the earlier, wholly unsupported opinion, demonstrates her fairness in evaluating the entire record.

### 6. The ALJ's use of a 10% off-task limit is explained by the record.

Jennifer's final contention is that the ALJ's accommodation within the RFC for Jennifer to be 10% off task is arbitrary and wholly unexplained. A fair reading of the ALJ's decision reveals otherwise. The ALJ explicitly stated that she relied on the VE's opinion about jobs availability. The VE explained that for unskilled jobs, such as the simple, routine jobs described by the ALJ in her hypothetical, employers typically accommodate an employee being about off task up to 10% (in addition to the time that the employee is given usual break times, including for meals). The VE also explained that employers would not tolerate 20% off task—in addition to regular work breaks—and thus if an employee would be off task that amount, the unskilled job base would be substantially eliminated. (R. 66). It is apparent to the court that the ALJ was willing to permit Jennifer to be off task at the top of the range but did not view the overall record as indicative of a person unable to function for five, 8-hour days in a week so long as the tasks were as simple as she described, required only a light level of work, and had accommodations for trouble with balancing.

## Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge AFFIRM the Commissioner's decision that Jennifer was not disabled.

Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). The failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Dated: February 2, 2022

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system